[No. 5839-5-III. Division Three. August 7, 1986.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT
RAY BEBB, *Appellant*.

*Frank Conklin,* for appellant (appointed counsel for appeal).

*Donald C. Brockett, Prosecuting Attorney,* for respondent.

THOMPSON, J.—Robert Bebb was convicted by a jury of first degree murder for killing Kay Divine in the course of an attempted robbery at the Password Answering Service office. His appeal raises issues concerning (1) his right to proceed pro se; (2) his right to a speedy trial; (3) the introduction of certain allegedly irrelevant evidence; (4) the closing argument of the prosecutor, which he asserts commented on his right to remain silent; and (5) the failure of the prosecutor to disclose allegedly favorable evidence. We affirm.

First, did the trial court infringe on Mr. Bebb's constitutional right to represent himself? Mr. Bebb initially represented himself and Assistant Public Defender Roger Peven was appointed to act as standby counsel. On November 9, 1982, during a hearing in which Mr. Bebb made several motions relative to preparation of his case, he asked the court if what he said to Mr. Peven was privileged. The prosecutor argued there was no attorney/client privilege

because Mr. Bebb "is both the attorney and the client." The court then commented: "That's about the way I see it as well." After Mr. Peven stated this effectively terminated Mr. Bebb's ability to talk to him about factual matters, the court concluded:

> I guess what I am saying here, Mr. Bebb, is your question isn't one that I'm going to precisely answer at this point. I've given you what my gut reaction is, and I think if there was some case law on it one way or the other, that would be more persuasive to me than a gut reaction.

Mr. Bebb continued to represent himself until January 7, 1983, at which time, prior to trial, he asked the court to appoint Mr. Peven cocounsel. He asserts that although he was proceeding pro se, he had a right to have standby counsel assist him. He reasons that without the assurance of an attorney/client privilege, he could not turn to Mr. Peven for assistance, and thus was effectively forced to abandon his right to represent himself.

The United States Supreme Court has never held a pro se defendant has a right to standby counsel to assist him in his defense. Rather, the Court has stated that such counsel may be appointed—even where the defendant objects—to aid the accused if he so requests and to be available to take over the defense if termination of the defendant's right to proceed pro se is necessary. *McKaskle v. Wiggins,* 465 U.S. 168, 79 L. Ed. 2d 122, 104 S. Ct. 944, 950 (1984) (quoting *Faretta v. California,* 422 U.S. 806, 834 n.46, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975)).

However, the Supreme Court has held that the constitutional right of access to the courts means that the state must provide jailed persons "adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977). In *State v. Dougherty,* 33 Wn. App. 466, 471, 655 P.2d 1187 (1982), this court held: "Where the defendant has knowingly and intelligently exercised his right of self-representation, the appointment of standby counsel meets the meaningful access requirement of *Bounds." See also*

*People v. Rice,* 40 Colo. App. 357, 579 P.2d 647, *cert. denied,* 439 U.S. 898, 58 L. Ed. 2d 245, 99 S. Ct. 261 (1978); Annot., *Accused's Right To Represent Himself in State Criminal Proceeding—Modern State Cases,* 98 A.L.R.3d 13, § 25 at 89 (1980) (access of defendant to legal re-sources).

We take judicial notice of the fact that the jail in which Mr. Bebb was incarcerated did not contain a law library. Although the court appointed a runner and investigator to assist Mr. Bebb, the person appointed was neither a lawyer nor a legal intern. Thus, Mr. Bebb's meaningful access to the court was, in this instance, through his standby counsel. But such counsel without an attorney/client privilege can-not provide a pro se defendant with the assistance neces-sary to fully protect the right of access. Specifically, a pro se defendant may have to disclose facts to his standby counsel in order to seek advice on various matters, includ-ing procedure, appropriate law books, and research mate-rial. He should not have to waive the confidentiality of these disclosures in order to achieve his right of meaningful access to the judicial process.

█ The material question here is whether the court's statement concerning the existence of a privilege so under-mined or chilled Mr. Bebb's ability to use standby counsel that it infringed upon his right of access. We hold it did not. The right of self–representation is not a license to avoid compliance with relevant rules of procedural and substantive law, *Faretta,* 422 U.S. at 834 n.46, since the rules apply equally to defendants represented by counsel or appearing pro se. *State v. Barker,* 35 Wn. App. 388, 392 n.1, 667 P.2d 108 (1983); *State v. Hoff,* 31 Wn. App. 809, 812, 644 P.2d 763, *cert. dismissed,* 459 U.S. 1093 (1982). Neither counsel nor pro se defendant may remain silent at trial as to claimed errors and later, if the verdict is adverse, urge trial objections for the first time in a motion for new trial or appeal. *Hoff,* at 812 (citing *Sherman v. Mobbs,* 55 Wn.2d 202, 207, 347 P.2d 189 (1959)).

As previously discussed, Mr. Peven noted on the record

that the court's ruling would terminate Mr. Bebb's ability to talk to him about factual matters.[1] In response to Mr. Peven's comment, the judge made it clear that his statement was no more than a "gut reaction". Later, on–record discussions made it clear that both the judge and Mr. Peven recognized the fact the court had not actually ruled Mr. Bebb did not have a privilege. In light of this unsettled situation, Mr. Bebb had the obligation to request a ruling which he could thereafter challenge if adverse. The judge's final remark left the issue unresolved and was not sufficiently specific to justify Mr. Bebb concluding his conversation with standby counsel was not privileged. A pro se defendant has no more right to subjectively elevate an informal observation to an appealable issue than would trained legal counsel. We conclude Mr. Bebb has failed to properly establish a reviewable issue.

Mr. Bebb also contends that the Superior Court never informed him of the risks of self–representation as set forth in *Bellevue v. Acrey,* 103 Wn.2d 203, 691 P.2d 957 (1984). However, his assignment of error is that he was *not* allowed to proceed pro se, rather than vice versa. In these circumstances, Mr. Bebb's reliance on *Bellevue v. Acrey, supra,* does not aid him. Mr. Bebb also alleges that law books mailed to him in the county jail were returned unopened by jail officials. The record does not provide sufficient facts to make it possible to review this complaint.

Second, was Mr. Bebb denied his right to a speedy trial under CrR 3.3? The following chronology is significant in analyzing Mr. Bebb's argument in this regard:

June 29, 1982: Mr. Bebb arrives in Washington following extradition from California.

July 21, 1982: He is charged with first degree murder. Trial is set for August 23, 1982.

---

[1] We note it is somewhat ironic that the perceived denial of an attorney/client privileged relationship is an issue on appeal. From the outset, Mr. Bebb insisted on representing himself and objected to the court forcing him to accept standby counsel.

July 30, 1982: Jon Komorowski, original standby counsel for Mr. Bebb, who is proceeding pro se, moves the court to appoint a sanity commission to examine Mr. Bebb. The court also appoints Mr. Komorowski to represent Mr. Bebb at the time the sanity commission examines him.

August 16, 1982: Prosecutor Brockett is granted a continuance of the August 23 trial date because one of the sanity commission's doctors will not be available to testify until the end of August.

August 19, 1982: The sanity commission's report is returned to the court. The two doctors on the commission agree that Mr. Bebb is suffering from a schizophrenic disorder.

August 23, 1982: The court hears the testimony of Dr. Robert Wetzler, one of the two doctors on the Bebb sanity commission. Dr. Wetzler describes Mr. Bebb as very incoherent and not competent to assist in his own defense. When the court indicates it needs further evaluation of Mr. Bebb before it can enter written findings as to competency, defense counsel points out that the statutory provisions for determination of competency have been met. RCW 10.77. Counsel suggests the court find Mr. Bebb incompetent, then order further evaluation.

August 24, 1982: The court hears further argument and enters an order dated August 25, 1982, ordering Mr. Bebb transported to Eastern State Hospital for a period not to exceed 15 days for further evaluation by Drs. Wetzler and Kilgore, the two doctors on the original commission.

October 26, 1982: Roger Peven is substituted as counsel for Jon Komorowski. He argues that RCW 10.77 does not provide for the further evaluation of Mr. Bebb at Eastern and that CrR 3.3 was not tolled during that time period. The court hears the testimony of three doctors who observed Mr. Bebb during his 4–hour stay at Eastern on August 26. One of the doctors, Chris Hopps, testifies that he advised Mr. Bebb of his right to have an attorney present during the examination, but Mr. Bebb made no response. All three doctors diagnosed Mr. Bebb as malin-

gering. The court finds him competent to stand trial and assist in his own defense. Written findings to that effect are entered on November 4, 1982.

November 9, 1982: The court sets November 29 as the trial date. It also orders Mr. Bebb to give handwriting samples to the prosecutor for the purpose of comparing his handwriting to the writing on a note found at the murder scene.

November 19, 1982: Mr. Bebb has refused to obey the court order to provide handwriting samples. Thus, the prosecutor asks for a continuance under CrR 3.3(h)(2) until December 13 so that his office may have additional time to prepare charts to pinpoint similarities between writing on the note and Mr. Bebb's writing in a letter to his sister. Further, since a prosecution witness is unavailable from December 10 until December 23, the prosecutor asks for another continuance until December 27, the earliest available date after the witness returns. Over Mr. Bebb's objection, the court grants the prosecutor's request and sets trial for January 10. On January 6, the prosecutor advises the court he has decided not to call that witness.

January 7, 1983: Mr. Bebb asks the court to appoint Mr. Peven as cocounsel. Over Mr. Bebb's objection, the court continues the trial for 1 week to allow counsel time to prepare.

January 17, 1983: The court orders a further continuance until January 24, again to allow time for defense counsel to prepare.

January 24–28, 1983: Mr. Bebb's trial occurs.

Mr. Bebb contends the speedy trial rule was tolled only from July 30, the date counsel requested appointment of a sanity commission to evaluate him, until August 23, the date the court heard the testimony of one of the commission's two psychiatrists and was advised that the second psychiatrist agreed with the testifying doctor that Mr. Bebb was not competent to stand trial. According to Mr. Bebb, RCW 10.77 does not authorize a second competency evaluation. In addition, he asserts the second evaluation violated

RCW 10.77 because it was performed by doctors chosen by the prosecutor alone and was done outside the presence of counsel.

Mr. Bebb also maintains the speedy trial rule was violated by (1) the continuance of the trial from December 13 until January 10 due to the unavailability of a prosecution witness; and (2) the continuance from January 10 until January 24 for defense counsel preparation.

## COMPETENCY PROCEEDINGS

CrR 3.3(g)(1) excludes the time for "[a]ll proceedings relating to the competency of a defendant to stand trial, terminating when the court enters a written order finding the defendant to be competent;" RCW 10.77 provides in part:

[.010(6)] "Incompetency" means a person lacks the capacity to understand the nature of the proceedings against him or to assist in his own defense as a result of mental disease or defect.

. . .

[.060(1)] Whenever . . . there is reason to doubt [a defendant's] competency, the court . . . shall either appoint or request the secretary [of the Department of Social and Health Services] to designate at least two qualified experts . . . to examine and report upon the mental condition of the defendant. For purposes of the examination, the court may order the defendant committed to a hospital or other suitable facility for a period of time necessary to complete the examination, but not to exceed fifteen days.

. . .

[.090(1)] If . . . the court finds following a report as provided in RCW 10.77.060 . . . that the defendant is incompetent, the court shall order the proceedings against him be stayed . . .

The statute also mandates:

(1) At any and all stages of the proceedings pursuant to this chapter, any person subject to the provisions of this chapter shall be entitled to the assistance of counsel . . . A person may waive his right to counsel; but such waiver shall only be effective if a court makes a specific

finding that he is or was competent to so waive. . . .

. . .

(4) Any time the defendant is being examined by court appointed experts or professional persons, . . . he shall be entitled to have his attorney present.

RCW 10.77.020.

 The Legislature enacted the foregoing statute in 1973 with the purpose of standardizing the procedures used to determine competency. *State v. Wicklund,* 96 Wn.2d 798, 801, 638 P.2d 1241 (1982). Prior to that time, the "Washington courts relied exclusively on their inherent judicial powers . . ." in this regard. *Wicklund,* at 801 (citing *State v. Johnston,* 84 Wn.2d 572, 576, 527 P.2d 1310 (1974)). Here, the court followed the procedures outlined in RCW 10.77.060 when it appointed the first sanity commission. However, that statute does not confine the court to the information gathered through the statutory procedures. The court retains the inherent authority referred to in *Wicklund,* to order whatever additional evaluations it deems necessary to determine a defendant's competency. Accordingly, the time taken for the second evaluation is also excluded under CrR 3.3(g)(1) as a proceeding relating to competency.

 CrR 3.3(g)(1) specifically states the exclusion terminates only "when the court enters a written order finding the defendant to be competent", not at some earlier time when a defendant's rights are allegedly violated during a competency proceeding. Thus, Mr. Bebb's remaining complaints, even if meritorious, would not mandate a dismissal under the speedy trial rule. The fact he was examined outside the presence of counsel and by doctors chosen by the prosecutor alone might have constituted valid challenges to the commission's conclusions if he had raised them during trial. But CrR 3.3 does not provide Mr. Bebb a remedy for these alleged errors.[2] Thus, we conclude the time period

---

[2]Mr. Bebb also complains that 2 months elapsed between the examination and the hearing on competency. However, he has not referred us to any section of RCW 10.77 which requires a hearing within a specified period.

between August 25 and November 4 was properly excluded under CrR 3.3(g)(1) as time for proceedings relating to competency.

## CONTINUANCES

█ The superior court's ruling on a motion for a continuance will not be disturbed on appeal absent a showing of manifest abuse of discretion. *State v. Campbell,* 103 Wn.2d 1, 14, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985) (citing *State v. Miles,* 77 Wn.2d 593, 597–98, 464 P.2d 723 (1970)). CrR 3.3(h)(2) provides that the court may continue the case "when required in the administration of justice and the defendant will not be substantially prejudiced in the presentation of his or her defense". The superior court has a duty to state on the record its reasons for failing to comply with the time limits of the rules. *State v. Williams,* 87 Wn.2d 916, 920, 557 P.2d 1311 (1976).

*Campbell* specifically found no abuse of discretion when, over the defendant's objection, the Superior Court granted counsel's motion for a continuance so the defense might adequately prepare the case for trial. *Campbell,* at 14–15. Similarly, we hold the court's continuance here for time for defense counsel preparation was proper.

As to the grant of the earlier continuance, the court stated its rationale included the facts that Mr. Bebb had disobeyed the court order to give a handwriting exemplar, a witness was unavailable, and a continuance would not substantially prejudice Mr. Bebb. The State had argued that because Mr. Bebb refused to supply a sample of his handwriting, it required extra time for preparation of demonstrative aids for use by its handwriting expert. According to the State, this pushed the trial date into a time period when a material witness was out of the country. We note the record indicates that by the time the witness was available on December 27, the judge to whom the case was preassigned would then be unavailable until the first of the year. Mr. Bebb's complaint that the court abused its discretion in granting the continuance is not persuasive since

the initial continuance was needed because he failed to obey a court order. Nor do we accept Mr. Bebb's argument that the continuance after December 13 was unnecessary because the State ultimately decided not to call the witness who was then unavailable. We will not overturn such a ruling on the basis of facts which develop later. Accordingly, Mr. Bebb's right to a speedy trial under CrR 3.3 was not violated.

Third, did the court err when it admitted the substance of Mr. Bebb's 1980 statement on a California prison form that he was involved in a possible unknown offense in Spokane, Washington in 1979? While in prison in California in 1980, Mr. Bebb had filled out a document entitled "Holds, Warrants, Detainers and Traffic Tickets". He listed past offenses, including: "Possible offense: unknown; approximate date: 1979; City: Spokane; County: Spokane; State: Washington". On January 6, 1983, while acting as his own attorney, Mr. Bebb stipulated that "on June 27, 1980, I indicated in writing that I might have been involved in a possible unknown offense in Spokane in 1979".

During trial, defense counsel argued the stipulation was only that the document's custodian need not be called as a witness. In his view, (1) the document was not admissible because it was irrelevant, *i.e.,* the jury could only speculate as to whether it referred to the crime charged here, and (2) to admit it would infringe on Mr. Bebb's right not to testify at trial, because it would compel him to take the stand to explain to what he was referring. The prosecutor maintained the statement was against penal interest and, thus, admissible. The court agreed.

Following Mr. Bebb's conviction, his counsel argued that the prosecutor in closing argument improperly characterized the statement as a confession after having represented to the court earlier that a CrR 3.5 hearing was not necessary because the statement was not one made to authorities.

## ADMISSIBILITY

■ "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "Minimal logical relevancy is all that is required." 5 K. Tegland, Wash. Prac. § 83, at 170 (2d ed. 1982). In *State v. Wilson*, 38 Wn.2d 593, 616, 231 P.2d 288, 300, *cert. denied*, 342 U.S. 855, 96 L. Ed. 644, 72 S. Ct. 81 (1951), the court stated the connection between evidence and relevant issues need not be a "necessary" connection but only "*reasonable and not latent or conjectural*". In *State v. Jones*, 26 Wn. App. 551, 552–53, 614 P.2d 190 (1980), the court found no abuse of discretion in the court's ruling which permitted the State to show that defendant's palm print had been found at the scene of the crime even though the State could not prove when the print was made. The court reasoned that the defendant's alibi that he had left the print on an earlier occasion went only to the weight of the evidence.

We hold the 1980 statement was relevant. It had some tendency, when viewed in conjunction with the other evidence, to make Mr. Bebb's guilt more probable. While the statement does not specifically refer to the shooting of Ms. Divine, it is reasonable to connect the statement with the incident. As the prosecutor pointed out in closing argument, Mr. Bebb may have referred to the offense as unknown because he did not know whether he had killed Ms. Divine. Moreover, Mr. Bebb did not have to take the stand to explain the evidence. Counsel was free in argument to attack the weight of the evidence by pointing out that the "unknown crime" referred to in the statement could have been a reference to something other than the murder.

## USE IN CLOSING ARGUMENT

Mr. Bebb also contends it was improper for the prosecutor to argue the statement was a confession when he had earlier assured the court no suppression hearing was

required because it was not a statement made to authorities. We could not find where in closing argument the prosecutor had referred to the statement point–blank as a "confession". Furthermore, Mr. Bebb did not request a suppression hearing and he makes no specific argument on appeal to support his contention that the statement was involuntary. He only asserts generally that "he was obviously being interrogated by the police officers in California and the issue of voluntariness is inherent in [this] . . . context." As noted in *State v. Falk*, 17 Wn. App. 905, 908, 567 P.2d 235 (1977):

> Nor does the failure to conduct a CrR 3.5 hearing require reversal. In the first place, defendant does not contend the statement, if made, was involuntary. . . . [T]he mere failure to hold a CrR 3.5 hearing does not render an otherwise admissible statement inadmissible.

(Citations omitted.) *See also State v. Kidd*, 36 Wn. App. 503, 509, 674 P.2d 674 (1983). Thus, the prosecutor's use of the statement was not error.

Fourth, did the prosecutor's comment in closing argument that the State's handwriting evidence was unrebutted amount to a comment on Mr. Bebb's failure to take the stand? A key piece of State's evidence was a handwritten note found at the scene of the crime which read: "This is a robbery. Give me the money box. I have a shotgun." The State's handwriting expert testified it was his opinion that Mr. Bebb had written the note. During closing argument, the prosecutor said:

> The handwriting evidence is interesting, isn't it? There is no evidence before you at all that this is not the handwriting of Robert Ray Bebb. . . . The defense did not call anyone to tell you that this is not his handwriting. What they chose to do, instead, was to quarrel with Homer Pointer, . . . [the State's expert]

■ A prosecutor can comment on the accused's failure to present evidence on a particular issue if persons other than the accused or his spouse could have testified for him on that issue. *State v. Ashby*, 77 Wn.2d 33, 38, 459 P.2d

403 (1969); *cf. State v. Roth,* 30 Wn. App. 740, 637 P.2d 1013 (1981). Here, Mr. Bebb could have produced a hand-writing expert or even a lay witness familiar with his hand-writing to rebut the State's expert's testimony. ER 701, 702. The prosecutor's argument, when read in context, was an effort on his part to contrast Mr. Bebb's failure to present evidence on the handwriting issue with the fact he did present expert evidence on the fingerprint issue. It is unlikely the jury would have interpreted the prosecutor's remarks as a comment on Mr. Bebb's own failure to testify. We find no error.

Fifth, did the court err when it concluded the State had no duty to turn over certain evidence sought by Mr. Bebb? In November 1982, the court denied Mr. Bebb access to police reports of investigations of two other suspects in the homicide. A review of these reports indicate: (1) the hand-writing of E.H. was analyzed because his parole officer believed it was similar to the handwriting on the note left at the murder scene. The FBI lab could not determine whether E.H. had written the note and it requested other exemplars if a further comparison was desired. (2) J.L. was arrested in Texas with a sawed–off shotgun. He had been in Spokane in early 1979. The Spokane Police Department secured three fired slugs from J.L.'s shotgun, but analysis by the Washington State Crime Lab indicated only that the slugs, like the one that killed Ms. Divine, had been fired from a rough barrel. A lab technician further indicated to Detective Staudinger that the markings left on the slugs from J.L.'s shotgun did not appear consistent with the slug that killed Ms. Divine. Officer Wanzenreid compared J.L.'s fingerprints with the prints left at the scene and concluded they did not match.

In October 1984, Mr. Bebb asked the court to set aside his conviction based on the failure of the State to disclose the above evidence. In February 1985, the court heard argument and then denied the motion, holding the evidence was not exculpatory, and, even if exculpatory, it was not sufficient to create a reasonable doubt as to Mr. Bebb's

guilt. We agree with the court's analysis.

Under CrR 4.7(a)(3):

> Except as is otherwise provided as to protective orders, the prosecuting attorney shall disclose to defendant's counsel any material or information within his knowledge which tends to negate defendant's guilt as to the offense charged.

*See also State v. Coe,* 101 Wn.2d 772, 784, 684 P.2d 668 (1984). The rule codifies the prosecutor's constitutional duty to disclose exculpatory matter to the defense. *State v. Campbell,* 103 Wn.2d 1, 17, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094 (1985).

■ Breach of this duty does not amount to constitutional error unless the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist. *Campbell,* at 17 (quoting *United States v. Agurs,* 427 U.S. 97, 112–13, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976)). In *United States v. Bagley,* ___ U.S. ___, 87 L. Ed. 2d 481, 105 S. Ct. 3375, 3384 (1985), the Supreme Court recently formulated the *Agurs* test as:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

In assessing the probability that the prosecutor's failure to disclose might have had an adverse effect on the defendant's preparation or presentation of his case, the appellate court should act "with an awareness of the difficulty of reconstructing in a post–trial proceeding the course that the defense and the trial would have [otherwise] taken . . ." *Bagley,* 105 S. Ct. at 3384. On the other hand, "[t]he mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial . . . does not establish 'materiality' in the constitutional sense". *State v. Mak,* 105 Wn.2d 692, 704–05, 718 P.2d 407 (1986).

Here, the evidence on its face was not exculpatory. At a

time when the State was culling through a myriad of pieces of evidence and suspects in an effort to solve a murder case, two names came to its attention. In processing J.L. and E.H. as possible suspects, the investigator sought the advice of experts. Those experts concluded that J.L.'s prints did not match the ones at the scene and the shotgun slugs were fired from a rough barrel, but the markings on the slugs taken from J.L.'s shotgun did not appear consistent with the slug that killed Ms. Divine. E.H.'s handwriting sample could not be satisfactorily compared to the handwriting on the note and additional samples were sought if further testing was requested. Relying on this information, the State concluded these were not viable suspects. The only connection between this evidence and these two suspects and Mr. Bebb was the fact that they involved the same murder investigation. It is purely speculative to believe this evidence could have been of any benefit to Mr. Bebb or could have affected the outcome of Mr. Bebb's trial. At most, if it could have been fully developed by Mr. Bebb that the State's experts were wrong, this still would have created merely a possibility that the outcome of Mr. Bebb's trial could have been different. This mere possibility will not comport with the "reasonable probability" referred to in the *Agurs* test as noted in *United States v. Bagley, supra,* and does not establish materiality in the constitutional sense as noted in *State v. Mak, supra.* The trial court did not err when it denied Mr. Bebb access to the evidence.

The judgment of the trial court is affirmed.

GREEN, C.J., concurs.

McINTURFF, J. (dissenting)—While the majority holds the attorney–client privilege protects the communications a pro se defendant makes to his standby counsel, it finds the Superior Court did not deny Mr. Bebb this privilege because it did not enter a formal ruling to that effect. I disagree with this latter finding. In matters which strike at

the heart of important constitutional rights, particularly when the rights are those of a pro se defendant, the court should not take such a legalistic approach.

I would distinguish *State v. Hoff,* 31 Wn. App. 809, 812, 644 P.2d 763, *cert. dismissed,* 459 U.S. 1093 (1982), which the majority relies upon for the proposition that a pro se must comply with relevant rules of procedural and substantive law. In *Hoff,* the Superior Court granted a pro se defendant a new trial because, *inter alia,* his defense was inept. On the State's appeal, the court reversed the order for new trial. *Hoff* noted at page 812 that a pro se defendant may not remain silent as to claimed errors, and later, if the verdict is adverse, urge his trial objections for the first time in his appeal. In contrast, Mr. Bebb raised the privilege issue in superior court. He simply did not know enough to secure a formal and final ruling on the issue. In these circumstances, I do not believe *Hoff* should be read to deprive Mr. Bebb of his claimed error.

We, as judges, recognize that although the law provides parameters for decision making, ultimately, each case stands on its own facts. In other words, justice often calls for an approach that does not fit neatly into a general rule. While the general rule is that pro se defendants are subject to the same procedural rules as attorneys, that rule should not be interpreted to avoid addressing issues raised, albeit clumsily, by the defendant in superior court. What is more important, Mr. Bebb's attorney–client privilege which is necessary to protect his constitutional right of access, or the entry of a technical ruling by a court which has already indicated its disposition? It seems to me that in distinguishing between a formal ruling and what occurred here we subject Mr. Bebb to a legal ambush.

The federal courts do not hold pro se plaintiffs to an attorney's standard of practice when judging whether the allegations of their complaints state claims for relief. *Haines v. Kerner,* 404 U.S. 519, 30 L. Ed. 2d 652, 92 S. Ct. 594, 596, *reh'g denied,* 405 U.S. 948, 30 L. Ed. 2d 819, 92 S. Ct. 963 (1972). Similarly, I would not expect Mr. Bebb to

have an attorney's understanding of the effective difference between the court's informal opinion and a court's final ruling entered after a motion. All he knew was that the judge did not view his communications with his standby counsel as privileged. Accordingly, he chose not to consult with Mr. Peven on any confidential matters and, as a result, he found it impossible to continue to adequately represent himself. Thus, he was denied his right of access to the courts which effectively denied his right to proceed pro se, and the denial of these rights constitutes reversible error.

I also disagree with the majority's holding that the evidence of the two other suspects, if disclosed to Mr. Bebb, would have created only a mere possibility that the outcome of his trial would have been different.

It is true the evidence on its face is not favorable to Mr. Bebb because the State's experts concluded, in the case of J.L., that his prints did not match the ones at the scene and, in the case of E.H., that the handwriting sample supplied by the police could not be satisfactorily compared to the handwriting on the note. However, the evidence involves opinion testimony upon subjects where experts may disagree. If the prosecutor had disclosed the evidence, Mr. Bebb may have secured expert testimony to contradict the State's experts. With such testimony, a reasonable probability, and much more than a possibility, exists that the result of Mr. Bebb's trial would have been different. The State, in obtaining the conviction, relied heavily on handwriting and fingerprint analysis. Under these circumstances, there is a probability sufficient to undermine confidence in the outcome of the jury's verdict.[3] Thus, the Superior Court erred when it denied Mr. Bebb access to the evidence.

Both the prosecutor's failure to disclose the foregoing

---

[3]Unlike the defendant in *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407 (1986), Mr. Bebb sought disclosure of specific evidence. Mr. Mak's request for disclosure was very general: he sought access to 800 pages of internal investigation material of the Seattle Police Department.

evidence, and the error relating to the attorney–client privilege prevented a fair trial under our state and federal constitutions.

The judgment of the Superior Court should be reversed and the case remanded for a new trial.

Reconsideration denied September 16, 1986.

Review granted by Supreme Court January 6, 1987.