[No. 53275-3.  En Banc.  July 23, 1987.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT RAY BEBB, *Petitioner.*

*Frank Conklin, Special Public Defender,* for petitioner.

*Donald C. Brockett, Prosecuting Attorney,* for respondent.

UTTER, J.—Robert Bebb appeals a Court of Appeals decision upholding his conviction for first degree felony murder. Bebb argues the trial court's pretrial rulings infringed upon his constitutional right to proceed pro se. He also challenges the trial court's authority to order a second round of pretrial psychiatric examinations to deter-

mine his competence, and raises issues concerning the discovery of exculpatory evidence. We have examined his contentions, and conclude that Bebb was given full and fair treatment by the trial court. Accordingly, we uphold the trial court and the Court of Appeals, and affirm the conviction.

Kay Devine was shot to death on January 17, 1979, while working at Password Answering Service in Spokane. At the scene, investigating officers found a handwritten note which read, "This is a robbery. Give me the money—Give me the money box. I have a shotgun." Report of Proceedings, vol. 3, at 256. Officer Wahzenreid of the Spokane County Sheriff's Department tested the note for fingerprints and found one partial thumbprint. In November of 1980, Wahzenreid compared the partial print with Bebb's known prints. In Wahzenreid's opinion, Bebb made the print on the note.

At this time, Bebb was incarcerated in California on an unrelated offense. About 4 months before, Bebb had filled in a document entitled "Holds, Warrants, Detainers, and Traffic Tickets" for California prison authorities, wherein he stated there was a "Possible offense: unknown" pending against him in Spokane. Report of Proceedings, vol. 3, at 300, 301. Bebb had given the date for this offense only as "1979."

On June 29, 1982, Bebb was extradited to Washington, handcuffed, chained, and under heavy guard. The officers accompanying him were armed with automatic weapons. Bebb was characterized by the California authorities as an extreme escape risk, and possibly dangerous. He and his wife had been connected with a group that claimed responsibility for an earlier jailbreak in Seattle during which a security officer was killed. Bebb was still serving the terms of his California sentence when he was extradited to Washington. In California, he had pleaded not guilty by reason of insanity to an escape charge.

On July 21, 1982, the Spokane County Prosecuting Attorney filed an information accusing Bebb of first degree felony murder. On that day, Bebb appeared with defense

counsel before Judge Donohue for arraignment. Defense counsel informed the court that Bebb wished to proceed pro se. The judge acceded to this request, but appointed a public defender to act as standby counsel, over Bebb's objections.

The next day, the judge questioned Bebb closely about his request to represent himself. The judge inquired into Bebb's education and background, and his familiarity with the requirements of legal research. The judge emphasized the seriousness of the charge and the difficulties that he would face attempting to represent himself while incarcerated. These concerns were conscientiously, scrupulously and patiently reiterated to Bebb by the several trial judges who heard his motions throughout the proceedings leading up to, during, and after trial. The trial judge emphasized Bebb's right to have counsel represent him free of charge. Bebb asked whether the court could appoint a private attorney to represent him, rather than anyone in the public defender's office. When he was told it could not, Bebb replied "Okay, well I don't want an attorney." Report of Proceedings, vol. 1, at 15. The judge accepted Bebb's waiver of counsel and again appointed a public defender to act as standby counsel. Standby counsel was directed to remain familiar with the case so that he could be prepared to take over as counsel for Bebb in the event that he was no longer able to proceed pro se.

On July 27, the parties appeared before the court on Bebb's motion for law books, paper, pens, and other similar requests. The judge ordered that Bebb be provided with a copy of the annotated Washington code and that standby counsel provide Bebb with a copy of whatever cases he requested. In response to the prosecutor's concerns about security, in light of Bebb's status as an extreme escape risk, the judge ruled that Bebb's telephone calls could be monitored and that his mail could be opened and read (but not censored) by jail officials, provided they had reasonable grounds to believe the contents were dangerous to jail security.

On June 30, standby counsel requested the judge to appoint a sanity commission to determine Bebb's present competency, as well as his sanity on the date of the homicide. Counsel based his request upon his discovery that Bebb had been found insane in connection with a 1968 California prosecution for escape. The court granted standby counsel's motion, and ordered the commission to examine Bebb to determine whether (a) he was competent to stand trial, and (b) whether he was sane at the time of the alleged offense.

The judge appointed a second commission after a hearing on the first commission's findings, which were incomplete. After the additional examinations were conducted, a hearing was held on October 26. The Eastern State Hospital psychiatrists who had examined Bebb all testified at that time that Bebb was a highly intelligent malingerer, and that he was, in their opinion, fully competent to stand trial and to conduct his own defense. Bebb participated in the hearing and questioned the doctors, and asserted several times "I am perfectly sane". Pretrial Report of Proceedings, at 166, 161. At this hearing, the prosecutor informed the court that he had received records from the California prison authorities that showed that, upon subsequent examination, they, too, had determined that Bebb was not insane but had been malingering. The judge found Bebb to be competent both to stand trial and to represent himself pro se. Bebb at no time challenged this finding.

On November 9, 1982, the parties again appeared before the court to discuss the nature of Bebb's relationship with standby counsel. Bebb told the court that he had received a letter from the public defender's office informing him that, "since my attorney–client thing [privilege] doesn't exist . . . there is a possibility anything that's done in this case can be forwarded to Mr. Brockett [the prosecutor]." Report of Proceedings, vol. 1, at 31. Bebb also requested that a new investigator be appointed to assist him. At the time, the public defender's office employed only one investigator, who had previously worked for the police department and

had worked on the investigation of the Devine homicide. The judge denied Bebb's motion for a different investigator.

The trial judge initially seemed to agree with the prosecutor that Bebb could not claim an attorney–client privilege regarding his communications with standby counsel. Standby counsel said for the record that he disagreed, and that nothing Bebb had told him would ever be revealed to the prosecutor. The parties apparently agreed that the interactions between Bebb and the investigator were privileged, however. The judge's ruling on the question was tentative and equivocal.

On January 7, 1983, the court granted Bebb's request to change standby counsel's status to that of cocounsel. Despite Bebb's repeated protestations that he was ready and wished to proceed to trial immediately, the prosecutor insisted that the court grant a continuance in order for counsel to prepare for trial. Counsel represented Bebb fully from that point on; Bebb made no attempt to reassert his pro se rights during trial.

Trial began on January 24, 1983. The State's evidence connecting Bebb to the killing consisted primarily of handwriting and fingerprint analyses. The State introduced a sample of Bebb's handwriting from a letter written to his sister from prison in California (with the references to his incarceration excised), since Bebb refused to comply with a court order to supply a handwriting exemplar for comparison purposes.

The State also presented Bebb's 1980 statement to California authorities that an "unknown" charge was pending against him in Spokane. The State also presented testimony of Bebb's wife's mother and her boyfriend, that Bebb owned a pair of shotguns, that he had sawed the stock off of one of them, and showed them how he could conceal it beneath his coat. These two witnesses also testified that they had communicated by mail and telephone with Bebb at the time of the killing, and that he was then in Spokane.

Bebb did not testify. Defense counsel called several fin-

gerprint experts who testified that the partial print of the note was too incomplete or indistinct to compare with Bebb's known prints. Defense counsel also vigorously cross-examined the State's witnesses, and appears to have generally carried out a competent and forceful defense. The jury found Bebb guilty of first degree felony murder as charged.

In February of 1985, Bebb moved for a new trial on the ground that the prosecutor had violated discovery rules. Bebb identified two pieces of evidence that the prosecutor had not provided. First, a parole officer who had seen the note found at the murder scene decided that the handwriting was similar to that of one of his parolees, E.H. A sample of E.H.'s handwriting had been sent to the FBI, which could not conclusively determine whether the robbery note had been written by him. Second, one J.L. was arrested in Texas, armed with a sawed-off shotgun of the same caliber as the murder weapon. J.L. had been in Spokane on the date of the murder. However, the State's fingerprint expert decided that J.L. had not left the print on the note at the murder scene. A lab technician indicated to detectives on the case that the markings left on the slugs tested from J.L.'s shotgun did not appear consistent with the slug that killed Ms. Devine.

The trial judge denied Bebb's motion for a new trial. The judge noted that he had examined these materials (except the FBI report on E.H.'s handwriting) in camera prior to trial, and decided then that they were not exculpatory. Upon reviewing the materials, the judge adhered to this view. The Court of Appeals affirmed the trial court in a split decision.

On appeal, we resolve three issues. First, the trial court acted within its authority in ordering a second round of psychiatric examinations. Second, the trial court did not err in denying Bebb's motion for a new trial on the discovery issue. Finally, the trial court did not infringe upon defendant's constitutional right to represent himself pro se.

## I

■ RCW 10.77.060(3)(e) confers power upon the trial court to direct an examination of the sanity of a defendant at the time of an alleged offense, and of his or her competence to stand trial. The trial court also has a constitutional obligation to assure itself of the defendant's competence, and possesses inherent authority to order the requisite examinations. *See State v. Wicklund,* 96 Wn.2d 798, 801, 638 P.2d 1241 (1982). Since the court is obligated under the constitution and by statute to make the ultimate finding as to defendant's competence, Bebb's contention that the court was without authority to order further examinations when it requires more information to make that determination, is untenable.

Bebb has failed to explain what the proper remedy would be if there had been a violation of his rights in this respect. No evidence obtained in the course of the examinations was introduced at any point in the proceedings other than the pretrial competency hearing. Bebb has never argued that he was incompetent to stand trial. Neither the trial court nor the Court of Appeals erred in their disposition of this issue.

## II

Bebb argues he was denied a fair trial by the prosecutor's failure to comply with discovery rules. The trial judge determined that the evidence in question was not exculpatory, and maintained that opinion upon Bebb's post–trial motion to set aside his conviction based on the prosecutor's failure to disclose that information. The trial court held the evidence was not exculpatory, and even if it was, it was not sufficient to create a reasonable doubt as to Bebb's guilt. The Court of Appeals agreed with the trial court's analysis, as do we.

■ The prosecutor has a constitutional duty to disclose exculpatory matter to the defense. This duty is breached where the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt as to defendant's guilt that did not otherwise exist. *State v. Campbell,* 103 Wn.2d 1, 17, 691 P.2d 929 (1984), *cert. denied,* 471 U.S. 1094, 85 L. Ed. 2d 526, 105 S. Ct. 2169 (1985); *United*

*States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976); *State v. Vaster,* 99 Wn.2d 44, 49, 659 P.2d 528 (1983). In *United States v. Bagley,* 473 U.S. 667, 683, 87 L. Ed. 2d 481, 105 S. Ct. 3375, 3384 (1985), the Court held the reviewing court should undertake its review "in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post–trial proceeding the course that the defense and the trial would have taken" with the inclusion of the evidence in question.

In *State v. Mak,* 105 Wn.2d 692, 705, 718 P.2d 407 (1986), the defendant claimed that the denial of his discovery request for materials from the Seattle Police Department's internal investigative files constituted reversible error. This court held that "[t]he mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial . . . does not establish 'materiality' in the constitutional sense." *Mak,* at 704–05. The prosecutor in the instant case argued that in virtually every police investigation there will be some suspects dismissed during the course of the investigation, and that the unremarkable fact that other suspects were once considered should not subject each prosecution to an *Agurs* challenge for failure to turn the police files over to the defense. We approve the reasoning of the Court of Appeals where, citing *Mak,* it concluded:

> [i]t is purely speculative to believe this evidence could have been of any benefit to Mr. Bebb or could have affected the outcome of Mr. Bebb's trial. At most, if it could have been fully developed by Mr. Bebb that the State's experts were wrong, this still would have created merely a possibility that the outcome of Mr. Bebb's trial could have been different. This mere possibility will not comport with the "reasonable probability" referred to in the *Agurs* test as noted in *United States v. Bagley, supra,* and does not establish materiality in the constitutional sense as noted in *State v. Mak, supra.* The trial court did not err when it denied Mr. Bebb access to the evidence.

*State v. Bebb,* 44 Wn. App. 803, 818, 723 P.2d 512 (1986). The trial judge's careful consideration of the items in ques-

tion, both before and after the trial, merits deference.

## III

Bebb contends the trial court's pretrial rulings regarding privilege within his relationship with standby counsel infringed upon, and ultimately compelled him to relinquish, his constitutional right to representation. The United States Supreme Court has held that an accused has a constitutional right under the Sixth Amendment and Fourteenth Amendment to represent him or herself in state criminal proceedings without the assistance of counsel. *Faretta v. California,* 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). The right is not absolute, however, and a pro se defendant is required under *Faretta* to make his motion to proceed pro se in timely fashion, or the right is relinquished, and the matter is left to the discretion of the trial judge. Nor is the right to self–representation a license to abuse the dignity of the courtroom. *State v. Fritz,* 21 Wn. App. 354, 585 P.2d 173, 98 A.L.R.3d 1 (1978). The court is under no duty to inform a pro se defendant of the relevant rules of law, *State v. Palmer,* 35 Or. App. 125, 580 P.2d 592 (1978), and the defendant must nonetheless conform to substantive and procedural rules. *Faretta,* 422 U.S. at 834 n.46; *State v. Barker,* 35 Wn. App. 388, 392 n.1, 667 P.2d 108 (1983). There is, moreover, no Sixth Amendment right to "hybrid representation," whereby a defendant serves as cocounsel with his attorney. *State v. Hightower,* 36 Wn. App. 536, 541, 676 P.2d 1016, *review denied,* 101 Wn.2d 1013 (1984); *Landers v. State,* 550 S.W.2d 272 (Tex. Crim. App. 1977); *State v. Burgin,* 539 S.W.2d 652 (Mo. Ct. App. 1976).

In order to ensure a meaningful pro se defense, the State must allow the defendant reasonable access to legal materials, paper, writing materials, and the like. *See generally Bounds v. Smith,* 430 U.S. 817, 828, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977) (regarding jailed persons' rights of access to the courts generally). Although the Spokane County Jail contains no law library, another acceptable method of pro-

viding this access is by appointing standby counsel, even over objection of the accused. *See Faretta v. California, supra* at 834 n.46; *State v. Dougherty,* 33 Wn. App. 466, 655 P.2d 1187 (1982), *review denied,* 99 Wn.2d 1023 (1983). Standby counsel's role is not to represent the defendant, however, but to provide technical information, and "to be available to represent the accused in the event that termination of the defendant's self–representation is necessary." *Faretta,* at 834 n.46.

Acknowledging the tentative nature of the trial court's ruling, it was incorrect in speculating that the attorney–client privilege does not apply to discussions between a pro se defendant and standby counsel. As discussed by the Court of Appeals:

> Mr. Bebb's meaningful access to the court was, in this instance, through his standby counsel. But such counsel without an attorney/client privilege cannot provide a pro se defendant with the assistance necessary to fully protect the right of access. Specifically, a pro se defendant may have to disclose facts to his standby counsel in order to seek advice on various matters, including procedure, appropriate law books, and research material. He should not have to waive the confidentiality of these disclosures in order to achieve his right of meaningful access to the judicial process.

*State v. Bebb, supra* at 806. The appeals court concluded, however, that the court's statement concerning the privilege did not so undermine Bebb's ability to use standby counsel that it infringed upon his right of access. We agree with this conclusion, but not for the reason stated by the Court of Appeals.

■ The trial court must establish that a pro se defendant who has relinquished his or her right to counsel made a knowing and intelligent waiver. *Bellevue v. Acrey,* 103 Wn.2d 203, 691 P.2d 957 (1984). Since the right to proceed pro se exists to promote the defendant's personal autonomy, rather than to promote the convenience or efficacy of the trial (and often operates to the defendant's detriment), courts generally find that relinquishment of the right to

proceed pro se is a far easier matter than waiver of the right to counsel. *Dorsey v. State,* 171 Ind. App. 408, 357 N.E.2d 280 (1976) (defendant's request for counsel subsequent to request to proceed pro se and acquiescence in proceedings renders moot the issue of whether the trial court erred in denying defendant the right to represent himself at trial). *See also People v. Lindsey,* 84 Cal. App. 3d 851, 149 Cal. Rptr. 47 (1978); *Tucker v. State,* 92 Nev. 486, 553 P.2d 951 (1976) (noting that the record showed that the defendant had voluntarily accepted representation by the public defender and had made no objection to such representation after it commenced).

The record simply does not support Bebb's claim that the trial court's statement actually interfered with standby counsel's legitimate functions. Counsel was able to provide Bebb with the law books and other materials he needed to prepare for trial, and the judge himself provided him with a copy of the annotated code. Finally, Bebb told the court at least 2 weeks before the scheduled trial date that he was ready to go to trial. When Bebb at that point asked that standby counsel be appointed as cocounsel, he did not say that the change was required because of any difficulties he had experienced in preparing the case. Once the trial commenced, Bebb acquiesced entirely in what the prosecutor and judge agreed was able representation by appointed counsel, in a case involving intricate details of expert testimony. The record does not show that Bebb did anything other than voluntarily waive his right to proceed pro se and reclaim his right to counsel. Accordingly, his conviction is affirmed.

PEARSON, C.J., and BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.